# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MINDY MACCLUSKEY,<br>        Plaintiff,<br><br>        v.<br><br>UNIVERSITY OF CONNECTICUT HEALTH<br>CENTER,<br>        Defendant. | No. 3:13-cv-1408 (MPS) |

## RULING ON POST-VERDICT MOTIONS

### I.    Introduction

Plaintiff Mindy MacCluskey brought this lawsuit against her employer, Defendant University of Connecticut Health Center ("UConn Health"), for violations of Title VII of the Civil Rights Act ("Title VII"). Specifically, Ms. MacCluskey claimed that she was repeatedly sexually harassed by another UConn Health employee named Michael Young while he was a dentist and she a dental assistant, and that UConn Health failed to respond appropriately. On August 31, 2016, after a four-day trial, a jury agreed, awarding Ms. MacCluskey $200,000 in damages. Before me now are three post-verdict motions filed by UConn Health: (1) a motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), (2) a motion for a new trial under Fed. R. Civ. P. 59 challenging the jury instructions and the exclusion of an e-mail from evidence, and (3) a motion for remittitur, i.e., reduction of the damages award. (ECF No. 100.) As set forth more fully below, I DENY UConn Health's motions for judgment as a matter of law and a new trial, because there was legally sufficient evidence to support the verdict, the jury instructions accurately stated the law, and I properly excluded the e-mail. However, I GRANT the motion for remittitur, as the damages award was excessive and should be reduced to $125,000.

## II.  Procedural History

Ms. MacCluskey filed a complaint against UConn Health on September 25, 2013, bringing claims of hostile work environment and gender discrimination under Title VII. (ECF No. 1.) On February 19, 2016, I granted in part and denied in part UConn Health's motion for summary judgment. (ECF No. 48.) I determined that that Dr. Young was not Ms. MacCluskey's "supervisor" under Title VII within the meaning articulated in *Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013), and therefore UConn Health was not strictly liable for the hostile work environment created by his sexual harassment. But I found that there was a genuine dispute of material fact as to whether UConn Health was negligent. I also deemed the separate gender discrimination claim abandoned.

In preparation for trial, Ms. MacCluskey and UConn Health submitted a joint trial memorandum, which included both parties' proposed jury instructions. (ECF No. 68.) I held jury selection on August 25, 2016, and the trial began the same day, continuing until August 30, 2016. (ECF Nos. 80; 81; 83; 87.)  I also heard and ruled on UConn Health's objections to the draft jury instructions at an August 30, 2016 charge conference. (ECF No. 87.)

On August 31, 2016, the jury returned its verdict in favor of Ms. MacCluskey, awarding her $200,000 in compensatory damages. (ECF No. 89.) The jury found that "Plaintiff has proven that she was subjected to a hostile work environment due to sexual harassment by Dr. Michael Young" and "Plaintiff has proven that the Defendant knew, or in the exercise of reasonable care should have known, about the harassment but failed to take appropriate remedial action." (*Id.*) UConn Health then filed post-verdict motions for judgment as a matter of law, a new trial, and remittitur. (ECF No. 100.)

III.    **Motion for Judgment as a Matter of Law**

A.      **Facts the Jury Reasonably Could Have Found**[1]

When the evidence presented at trial is construed in the light most favorable to the plaintiff, and all reasonable inferences are drawn in her favor, the jury could have found the following facts.

The story of this case begins in late 1999-early 2000, when a female dental assistant (not the plaintiff) complained about the behavior of Dr. Michael Young, the dentist she worked with at UConn Health, to the Connecticut Commission on Human Rights and Opportunities.  Though the parties disputed the nature of the conduct underlying that complaint at trial, the jury could reasonably have concluded that Dr. Young sexually harassed this dental assistant. Witness Karen Duffy Wallace, Director of Labor Relations for UConn Health at the time, testified that Dr. Young's conduct involved sending anonymous notes and gifts, and that the notes included "middle school crush" messages, such as "[y]ou're beautiful" and "I love your smile." (ECF No. 111 at 134-38.) Ms. Wallace, however, was an employee of UConn Health, and the evidence showed that she was involved in formulating the discipline for Dr. Young both in connection with the earlier complaint and in connection with his later sexual harassment of Ms. MacCluskey. The jury could thus reasonably have concluded that Ms. Wallace had an incentive to minimize the seriousness of

---

[1] As discussed in more detail below, I must, in deciding a Rule 50 motion, view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  Further, I must leave credibility determinations to the jury and disregard all evidence favorable to the moving party that the jury was not required to believe.  *See, e.g., Lore v. City of Syracuse*, 670 F.3d 127, 150 (2d Cir. 2012) ("[A] jury is entitled to believe part and disbelieve part of the testimony of any given witness, and its assessments of witness credibility and its choices between competing factual inferences are not to be second-guessed") (internal citations omitted); *Wat Bey v. City of New York*, 2013 WL 12082743 *7 (S.D.N.Y. Sep. 4, 2013) ("[T]he jury was not legally required to believe any of Caruso's testimony…."). Although I reviewed all of the evidence in crafting the recitation of facts, I have, in some cases where the evidence conflicted, included only the version of the evidence favorable to the non-moving party.  I have noted in other places where there was conflicting evidence—evidence that the jury was not required to believe.

Dr. Young's earlier conduct, including by characterizing the behavior of a grown man as juvenile "middle school" behavior. Further, as Ms. MacCluskey's counsel pointed out during the trial, both the resignation agreement that Dr. Young ultimately signed in 2011 following his sexual harassment of Ms. MacCluskey and the agreement he signed in 2000 used the same characterization: "offensive conduct."   (ECF No. 37-6 at 2.) From this, the jury could have reasonably inferred that the 1999-2000 conduct, like the 2011 conduct, included sexual harassment.

The earlier dental assistant's complaint resulted in a "last chance" agreement between Dr. Young and UConn Health, signed in February of 2000. (*Id.*) The last chance agreement included a ten-day suspension for "offensive conduct towards a co-worker, poor judgment, and not cooperating during the initial investigation" and provided that Dr. Young could be fired for "any future instances of unsolicited flirtatious letters or comments to any employee, or any behavior similar to this." (*Id.*) Dr. Young was also required to see a psychiatrist, which the jury could have understood as further evidence of the seriousness of the underlying conduct and UConn Health's awareness of it. (*Id.*; ECF No. 111 at 157-58.)

Ms. MacCluskey introduced evidence that Dr. Young received no extra attention, monitoring, or training as a result of the 2000 complaint and last chance agreement. In fact, the three or so trainings he received over the decade between the earlier complaint and Ms. MacCluskey's 2011 complaint were simply the standard trainings for UConn Health employees. (ECF Nos. 111 at 138; 112 at 56-58.) Two of those training sessions were self-administered by the employee at his/her computer terminal, and there was thus no way to be sure that Dr. Young had, in fact, participated in those training sessions. (*Id.*)  Although UConn Health's own policy required it to "monitor" Dr. Young's conduct, UConn Health took no steps to do that, even after the earlier

complaint and last chance agreement. (ECF Nos. 111 at 139; 112 at 14.)  Ms. MacCluskey also introduced evidence that UConn Health did not make Dr. Young's later supervisors aware that he had been the subject of a sexual harassment complaint and had received discipline as a result of that complaint in the form of the last chance agreement. (ECF No. 111 at 142-145.) Instead, after 2000, UConn Health simply "moved on." (*Id.*)

In March 2008, UConn Health hired Ms. MacCluskey as a dental assistant, and on December 5, 2008, she began working two days a week at a Department of Corrections facility called Manson Youth Institute ("Manson") with Dr. Young. (ECF No. 110 at 25-26.) Both UConn Health and the Department of Corrections had policies in place prohibiting sexual harassment, and Ms. MacCluskey was aware of these policies. (*Id.* at 70.)

About six months after Ms. MacCluskey began working at Manson, Dr. Young started making comments about her appearance and what she was wearing, such as that she was "so young and beautiful" and he was surprised that she had three children. (ECF No. 110 at 28.) He asked personal questions that made her feel uncomfortable, including about her relationship with her children's father and whether "anybody had ever cheated." (*Id.* at 28-29.) Dr. Young also stood too close to Ms. MacCluskey when he asked her questions, in a way she described as "creepy" and "weird." (*Id.*)

Ms. MacCluskey testified that while at Manson, in 2009 or 2010, she reported Dr. Young's conduct to both a co-worker and a nurse who was a union representative. (*Id.* at 29-30.) Someone then reported that there was a concern in the dental clinic to Dr. Alexis Gendell, who was both Ms. MacCluskey's and Dr. Young's supervisor at Manson. (ECF No. 112 at 11.) According to Ms. MacCluskey, Dr. Gendell stopped her in the hallway and asked, "if there was a situation, is everything okay." (ECF No. 110 at 30, 67-68.) According to Ms. MacCluskey, she told Dr. Gendell

that, "there is a situation and I'm all set. It is under control." (*Id.* at 69). She testified that this conversation took place in the hallway, where others were present, and that she felt "embarrassed" and "uncomfortable." (*Id.* at 30-31.) Ms. MacCluskey said, "I felt at this point in time that he [Dr. Young] was respecting my boundaries when I reminded him to." (ECF No. 111 at 46.) Dr. Gendell contradicted some of this account. She testified that she summoned Ms. MacCluskey to her office, where the conversation was held in private. (ECF No. 112 at 12.)  She testified that she asked Ms. MacCluskey "[w]hat's the concern" and that Ms. MacCluskey responded that "she was all set. And if there were any concerns that she would take care of them and that things were okay." (*Id.* at 12-13.) As the judges of the facts and the credibility of the witnesses, the jury was, of course, entitled to accept Ms. MacCluskey's testimony and reject Dr. Gendell's.

Ms. MacCluskey introduced evidence that Dr. Gendell did not follow up on this conversation. (ECF No. 111 at 46.) After questioning Ms. MacCluskey in the hallway about unspecified concerns, Dr. Gendell did not inquire what those concerns were, or make an effort to investigate whether Dr. Young had a history of "concerns" with other co-workers. As noted, UConn Health did not make Dr. Gendell aware of Dr. Young's previous conduct or discipline. Further, as already discussed, UConn Health did not monitor Dr. Young's conduct, and Dr. Gendell did not do so even after her conversations with Ms. MacCluskey. The dental clinic at Manson was at the end of a U-shaped hallway and there were few visits by supervisors to the interior. (ECF No. 110 at 26-27, 67-68.) A witness from UConn Health's Office of Diversity and Equity ("ODE") testified that the nature of the prison work environment raised a "concern" in that the "nature of the work the dental assistant does with the dentist keeps them in close proximity and in a separate area in the Dental Clinics," which was removed from "the population at large" or "the larger medical unit." (ECF No. 111 at 62.) Nonetheless, Ms. MacCluskey testified that no one

came into the clinic to examine the work environment, even after her conversation with Dr. Gendell. (ECF No. 110 at 52.) There were no cameras in the clinic. (*Id.* at 26-27.)

In August 2010, Ms. MacCluskey asked to be transferred to MacDougal-Walker Correctional Institution ("Walker"), where she would be assigned to work with Dr. Young three days a week. (ECF No. 110 at 32-33.) In requesting the transfer, Ms. MacCluskey reported that she and Dr. Young worked "extremely well together." (ECF No. 37-8 at 27.) She testified that she needed to take the job at Walker because she needed more hours to support her family and that, though she had concerns about working an extra day with Dr. Young, she "thought that [she] could handle it." (ECF No. 110 at 34.) UConn Health approved the transfer, and Ms. MacCluskey began working at Walker on December 2010. (*Id.* at 40.)  Again, there were no cameras in the clinic, even though it was located in a prison in which cameras were otherwise ubiquitous. (*Id.* at 33; ECF No. 111 at 62.)

Over a series of months, Dr. Young's harassment of Ms. MacCluskey escalated. Dr. Young repeatedly commented on Ms. MacCluskey's appearance and asked her out.  (ECF No. 110 at 36-50.) She testified that he brought a Victoria's Secret lingerie catalogue to work, "chased [her] around the clinic," and asked her to model lingerie for him (*id.* at 41); later, he pulled out a swimsuit catalogue and asked her to model swimsuits. (*Id.*) E-mails presented at trial showed that Dr. Young emailed Ms. MacCluskey asking how he could make her "blush," telling her that there were "rules" in her new position as a dental assistant working with him such as "we kiss each other before work and when leaving," asking her about "crazy hookups," and telling her, "I love you 2." (ECF No. 37-9 at 42, 59, 61, 62.) Ms. MacCluskey testified that Dr. Young told her that he had helped her get the job, and that she "owed him." (ECF No. 110 at 39.) She also testified that Dr. Young repeatedly bumped into her, touched her hair and her hands, and gave her shoulder rubs.

7

(ECF No. 110 at 40.) He would sometimes stand in the doorway silently for sustained periods, watching while she worked. (*Id*. at 40, 46.)  He sent a Valentine's Day gift to her house, even though she had never given him her home address; as someone who worked in a prison, she kept her home address a closely guarded secret. (*Id.* at 53.) On one occasion, he stood in the doorway to block her from leaving a room in the dental suite, and when she tried to do so, he grabbed her waist, pulled her close, and put his hand up her shirt.  (*Id.* at 46.) Ms. MacCluskey also testified that if she asked or told him to stop, at times that would only make him more persistent in his behavior. (*Id.* at 50.) There were no other witnesses to Dr. Young's conduct. (*Id.* at 41.)

A jury crediting her testimony could easily have found that Ms. MacCluskey—who was crying during portions of the trial—subjectively found the environment created by the harassment to be abusive, and that a reasonable woman in her position would have found the harassment to be severe or pervasive enough to create an objectively hostile work environment.

On February 24, 2011, after Dr. Young put his hand up her shirt, Ms. MacCluskey reported the sexual harassment to her supervisor at Walker, Rikel Lightner, and filed an incident report. (ECF No. 110 at 47.) That same day, Ms. Lightner reported the complaint to ODE and Ms. Wallace, the Director of Labor Relations. (ECF No. 112 at 99-100.) On February 25, 2011, UConn Health placed Dr. Young on paid administrative leave. (*Id*.) ODE conducted an investigation in which Dr. Young admitted that he had given "shoulder rubs" to two other dental assistants as well. (ECF No. 37-9 at 16.) Although there was no evidence that that conduct was reported, Ms. MacCluskey argued that it had also been allowed to occur due to UConn Health's failure to monitor Dr. Young, as required by its own policy. (ECF No. 113 at 32.)

The ODE investigation concluded that Dr. Young "violated [the internal policy] prohibition against sexual harassment," that Ms. MacCluskey's complaint of sexual harassment

was credible, and that Dr. Young's suggestions that his conduct—much of which he admitted—was welcome was not credible. (ECF Nos. 37-9 at 31; 111 at 55-56.) Dr. Young chose to resign rather than be fired.

### B.     Legal Standard

"Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998).

> In considering a motion for judgment as a matter of law, the district court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Thus, although the Court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.

*Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citation, quotation marks, and alterations omitted). "Although a party making a Rule 50 motion always faces a heavy burden, that burden is particularly heavy, where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Newton v. City of New York*, 779 F.3d 140, 146 (2d Cir. 2015) (citation, quotation marks, and alteration omitted). In that circumstance, the Court may only grant judgment as a matter of law where "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him." *Cross v. N.Y. City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005) (citation, quotation marks, and alterations omitted).

## C.     Discussion

To prevail on her Title VII hostile work environment claim against UConn Health, Ms. MacCluskey needed to prove: "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (citation and quotation marks omitted). In a case such as this one, "when the harassment is attributable to a coworker, rather than a supervisor, the employer will be held liable only for its own negligence." *Id.* (citation, quotation marks, and alteration omitted.) "Accordingly, [the plaintiff] must demonstrate that her employer failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Id.* (internal citation and quotation marks omitted).

At issue in this motion is not the hostile work environment itself, but whether there was sufficient evidence for a reasonable jury to impute the conduct that created the hostile work environment to the defendant, UConn Health. UConn Health argues that the evidence is legally insufficient to prove that "in the exercise of reasonable care [it] should have known, about the harassment yet failed to take appropriate remedial action." *Id.* (citation and quotation marks omitted). I disagree.

### 1.     *Constructive Notice*

Contrary to UConn Health's assertion, there was sufficient evidence to support the jury's finding that, in the exercise of reasonable care, UConn Health should have known about Dr. Young's harassment of Ms. MacCluskey, i.e., constructive notice. When the evidence presented

at trial is construed in the light most favorable to Ms. MacCluskey and all reasonable inferences are drawn in her favor, the jury could have found the following.

- A different female dental assistant complained to UConn Health about Dr. Young's sexual harassment in 1999-2000. UConn Health disciplined Dr. Young for that incident and subjected him to a "last chance agreement."

- In the exercise of reasonable care, Ms. MacCluskey and Dr. Young's supervisors, including Dr. Gendell, should have been made aware of the 2000 complaint, Dr. Young's prior sexual harassment of a dental assistant, and the discipline imposed on him. They were not.

- In the exercise of reasonable care, per UConn Health's own policy, Dr. Gendell and other supervisors should have been monitoring Dr. Young for warning signs of similar conduct towards dental assistants, for example, through cameras, visits to the interior of the clinic, and sexual harassment training sessions beyond the standard, self-administered trainings for all UConn Health employees. They did not. The remote location of the dental clinics in the prisons, and the close physical proximity between the dentist and dental assistant, which raised a "concern" later in the eyes of the ODE, only underscored the need for monitoring.

- In 2009 or 2010, Ms. MacCluskey complained about Dr. Young's harassment to two co-workers, and someone reported a concern in the dental clinic to Dr. Gendell.

- In response to that report, Dr. Gendell asked Ms. MacCluskey if there was a "situation" and "is everything ok" in the hallway where others could hear. (ECF No. 110 at 30-31, 67-68.) When Ms. MacCluskey responded, "there is a situation and I'm all set. It is under control," Dr. Gendell let the matter drop. (*Id.* at 46, 69.) In the exercise of reasonable care, Dr. Gendell should have had this sensitive conversation in a private space, asked follow up questions, and monitored Dr. Young or at least visited the dental clinic.

On that basis, a reasonable jury could have concluded that if UConn Health and Dr. Gendell had exercised reasonable care, Dr. Gendell would have known about Dr. Young's harassment of Ms. MacCluskey in 2009 or 2010.

This is not to say that the 2000 complaint by a different dental assistant, by itself, would have been sufficient to sustain a finding of constructive notice. In *Murray v. N.Y. Univ. Coll. of Dentistry*, the Second Circuit held that where a supervisor had received a complaint that a patient was harassing the plaintiff-dental student, and the supervisor reprimanded the patient promptly, the supervisor had no constructive notice of ongoing harassment. 57 F.3d 243, 250 (2d Cir. 1995). "Without an allegation that [the supervisor] was ever informed that her admonition had not been heeded, there can be no inference that [the supervisor], and thereby [the employer], had any notice that the harassment continued." *Id.*

By the same token, Ms. MacCluskey's general statement to Dr. Gendell in 2008 ("there is a situation and I'm all set. It is under control") would not, on its own, have supported a reasonable inference of constructive notice. Again in *Murray*, where the plaintiff later complained to a *different* supervisor in vague terms that the patient was staring at her, the Court held that the second supervisor lacked constructive notice of sexual harassment. "Though [the plaintiff] must have viewed it as having sexual overtones in light of [the patient's] past behavior, the complaint does not suggest that she informed [the second supervisor] of its sexual connotations." *Id.*

In this case, however, the jury could reasonably have found a larger aggregation of facts— not only the 2000 complaint of Dr. Young's past sexual harassment under similar circumstances, but also UConn Health's failure to make Dr. Young's supervisors, who included Dr. Gendell, aware of Dr. Young's history, the unmet responsibility to monitor Dr. Young, the fact that Ms. MacCluskey and Dr. Young were working in close quarters in a remote location, the report of a

concern in the dental clinic, and Ms. MacCluskey's comments about a "situation." As in *Duch*, the

jury could have concluded that "the indications of sexual misconduct were sufficiently strong"—

or at least that they would have been had UConn Health taken steps to inform Dr. Gendell of Dr.

Young's history—"that [the supervisor] had a duty to make at least a minimal effort to discover

whether [the co-worker] had engaged in sexual harassment," and that Dr. Gendell failed to make

that effort. 588 F.3d at 765. As the Second Circuit has explained,

> under the existing law of this Circuit, when an employee's complaint raises the specter of sexual harassment, a supervisor's purposeful ignorance of the nature of the problem… will not shield an employer from liability under Title VII. Accordingly, notwithstanding the… observation that [the supervisor] was never told of, and did not witness, the alleged harassment, we hold that a reasonable jury could conclude that [the supervisor] knew, or in the exercise of reasonable care should have known, about the harassment.

*Id.* at 766 (internal citations and quotation marks omitted). Especially when Dr. Young's past

history and UConn Health's own policy requiring ongoing monitoring are taken into account, Ms.

MacCluskey's confirmation to Dr. Gendell that "there is a situation," albeit one "under control,"

was as telling an "indication [] of sexual misconduct" as the plaintiff's remarks to her supervisor

in *Duch*, and thus similarly imposed on Dr. Gendell "a duty to make at least a minimal effort to

discover whether [Dr. Young] had engaged in sexual harassment." 588 F. 3d at 765.

Finally, because she was both Dr. Young's and Ms. MacCluskey's supervisor, Dr.

Gendell's constructive knowledge of Dr. Young's sexual harassment of Ms. MacCluskey can be

imputed to UConn Health (UConn Health does not dispute this). *See id.* at 763 ("[O]fficial's actual

or constructive knowledge of harassment will be imputed to the employer when…. a) the official

is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the

company, or b) the official is charged with a duty to act on the knowledge and stop the harassment,

or c) the official is charged with a duty to inform the company of the harassment"; holding that

13

harasser's supervisor's knowledge could be imputed to employer) (citation and quotation marks omitted).

2. *Reasonable Complaint Procedure*

UConn Health also argues that it cannot be found negligent as a matter of law, because it had a reasonable official complaint procedure, Ms. MacCluskey did not take advantage of that procedure or otherwise act to avoid harm for years, and as soon as she formally complained in 2011, UConn Health responded appropriately by terminating Dr. Young. *See* ECF No. 102 at 13 ("If the employer has a reasonable avenue for complaint and then acts on complaints of coworker sexual harassment, it cannot be held liable.") The short answer to this argument is that it misstates the law applicable to employers in cases of co-worker harassment. As shown above, the employer is liable in such cases if the plaintiff proves *either* "that her employer failed to provide a reasonable avenue for complaint *or* that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch*, 588 F.3d at 762 (citations and quotation marks omitted; emphasis added); *id.* at 763 ("Despite offering a reasonable avenue of complaint to plaintiff, employer defendants can still be held liable if plaintiff can show that they knew, or in the exercise of reasonable care should have known, about the harassment yet filed to take appropriate remedial action.")

UConn Health also argues that it could have established an affirmative defense to liability had Dr. Young been Ms. MacCluskey's supervisor under *Vance*, and that no higher standard should apply here, just because he was her co-worker. That too, is incorrect, and it is also beside the point, because this case did not involve harassment by a supervisor. When a supervisor harasses an employee, the employer is strictly liable, unless the case does not involve "tangible employment action" (e.g., conditioning a promotion on sexual favors) and unless the employer can prove both

of two elements of what is known as the *Faragher/Ellerth* affirmative defense: "(1) the employer exercised reasonable care to prevent and correct promptly any discriminatory harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ferraro v. Kellwood Co*, 440 F.3d 96, 102 (2d Cir. 2006) (citation and quotation marks omitted). While the Second Circuit stated in *Ferraro* that "[a]n employer may demonstrate the exercise of reasonable care, required by the first element, by showing the existence of an antiharassment policy during the period of the plaintiff's employment," it also stated, in the same sentence, "that fact alone is not always dispositive." *Id.* The Supreme Court has "reject[ed] [the] view that the mere existence of a grievance procedure and a policy against discrimination, coupled with respondent's failure to invoke that procedure, must insulate petitioner from liability." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986); *see also Finnerty v. William H. Sadlier, Inc.*, 176 F. App'x 158, 162 (2d Cir. 2006) (summary order) ("*[A]lthough it is not dispositive*, one way for employers to demonstrate that they exercised reasonable care is to show that they had an anti-harassment policy in place.") (citation, quotation marks, and alteration omitted; emphasis added). In any event, as noted above, in a co-worker harassment case like this one, the standard is different, and the *Faragher/Ellerth* defense does not apply. *See Bartniak v. Cushman & Wakefield, Inc.*, 223 F. Supp. 2d 524, 529 (S.D.N.Y. 2002) ("*Faragher/Ellerth* does not apply to this case. When a hostile working environment is created by a co-worker, the employer is not subject to strict liability and there is no need to consider an affirmative defense.")

### IV.    Motion for a New Trial

### A.    Legal Standard

Along with a renewed motion for judgment as a matter of law, the movant "may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). A motion for a new trial pursuant to Fed. R. Civ. P. 59 "ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Kosmynka v. Polaris Indus.,* 462 F.3d 74, 82 (2d Cir. 2006) (citation, quotation marks, and alterations omitted). "An erroneous jury instruction requires a new trial, unless the error is harmless." *Velez v. City of N.Y.*, 730 F.3d 128, 134 (2d Cir. 2013).  "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Id.* (citation and quotation marks omitted). And "[a] new trial may be warranted if substantial errors were made in admitting or excluding evidence." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 202 (2d Cir. 2014) (citation and quotation marks omitted).  However, "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple." *Lawyers Title Ins. Corp. v. Singer*, 792 F. Supp. 2d 306, 312–13 (D. Conn. 2011), *aff'd sub nom. Halica v. Singer*, 511 F. App'x 27 (2d Cir. 2013) (citation and quotation marks omitted).

### B.    Jury Instructions

UConn Health contends that the jury instructions in this case were erroneous and that the errors were not harmless.  I disagree. My final jury instructions, quoting liberally from the Second Circuit's opinion in *Duch*, read in pertinent part:

> If you find that the plaintiff was sexually harassed by Dr. Young and that the harassment created a hostile work environment, the Defendant is liable if the Plaintiff demonstrates that the employer knew, or in the exercise of reasonable care should have known, about the harassment but failed to take appropriate remedial action. To determine whether the

16

Defendant's response was reasonable, you must consider the totality of the circumstances. Factors to be considered in this analysis are the gravity of the harm being inflicted upon the Plaintiff, the nature of the employer's response in light of the employer's resources, the nature of the work environment, and the timeliness of the response in light of the level of control and legal responsibility that the employer had over the behavior of the accused harasser. This is not an exhaustive list.

This standard requires the Plaintiff to show that (1) someone knew or in the exercise of reasonable care should have known of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable. An employee's or official's knowledge can be imputed to the employer when (a) the official is at a sufficiently high level in the company's management hierarchy to qualify as a substitute for the company, (b) the official has a duty to act on the knowledge and stop the harassment, or (c) the official has a duty to inform the company of the harassment.

(ECF No. 113 at 23- 24.)

### 1.    Anti-Harassment Policy

UConn Health argues that the Court erroneously omitted jury instructions about its anti-harassment policy and the steps it took to prevent harassment. It maintains that the Court should have included instructions on the anti-harassment policy: (1) as a theory of liability, (2) as evidence of reasonableness, and (3) as a defense to liability.[2] Specifically, UConn Health proposed the following jury instructions:

An employer will be held liable for harassment perpetrated by its employees if the employer provides no reasonable avenue for complaint or [t]he employer knew of the harassment but unreasonably failed to stop it…. In considering whether or not UConn Health took reasonable steps to address the situation you should consider whether

---

[2] UConn Health also argues that the instruction "…the Defendant *is liable if* the Plaintiff demonstrates…." improperly converted a negligence standard into one of strict liability. To the extent that this is a separate argument that I should have tweaked the wording to read, "the Defendant *is liable only if*" or "the Defendant *will not be liable unless,*" it is unavailing. First, UConn Health has not pointed to a portion of the record in which it objected to this particular phrasing, and I recall no such objection. Second, UConn Health's own proposed instruction used phrasing similar to mine: "An employer *will be held liable* for harassment perpetrated by its employees *if the employer provides* no reasonable avenue for complaint or [t]he employer knew of the harassment but unreasonably failed to stop it." (ECF No. 86 at 18 (citation, quotation marks, and alteration omitted; emphasis added).)

1. The University of Connecticut and its unit Correctional Managed Health Care had established an explicit policy against harassment in the workplace on the basis of gender.
2. That policy was fully communicated to its employees.
3. That policy provided a reasonable way for Plaintiff to make a claim of harassment to higher management.
4. Reasonable steps were taken to correct the problem, if raised by the Plaintiff.

Accordingly, for you to find that the defendant UConn Health Center was negligent, the plaintiff must prove that the defendant UConn Health Center failed to provide a reasonable avenue for complaint, or that it knew, or in the exercise of reasonable care should have known about the harassment yet failed to take appropriate action, i.e., remedial or corrective action.

(ECF No 86 at 18-19 (internal citations, quotation marks, and alterations omitted).) UConn Health

also requested that I add:

An employer is insulated from Title VII liability if a plaintiff does not invoke her employer's internal grievance procedure if the failure to report is not attributable to the conduct of the employer or its agent. Additionally, in these considerations, you should determine whether the plaintiff failed to take advantage of any protective or corrective measures provided by the employer. In considering any evidence or testimony from plaintiff as to why she either failed or delayed in reporting harassment, any claim that she feared of losing her job must be a credible fear- that is, it must be based on more than the employee's subjective belief. In this regard, the plaintiff must produce evidence that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints.

(*Id.* at 20-21 (internal citations and quotation marks omitted).)

First, UConn Health argues that I erred in omitting "failure to provide a reasonable avenue for complaint" from my explanation of liability. As discussed above, in a case of co-worker harassment under Title VII, the law provides two possible theories of liability: the plaintiff "must demonstrate that her employer failed to provide a reasonable avenue for complaint *or* that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch*, 588 F.3d at 762 (citations and quotation marks omitted, emphasis added). To prevail, Ms. MacCluskey needed to prove only one of these two theories. *See id.* at 763 ("Despite offering a reasonable avenue of complaint to plaintiff, employer defendants

can still be held liable if plaintiff can show that they knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.") (citation and quotation marks omitted). And as the Court explained during the charge conference, it did not include instructions on the first theory because Ms. MacCluskey had not made any claim about a lack of reasonable avenue for complaint and there was no evidence in the case to support it. (ECF No. 115 at 6-8.)[3]  *See Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 153 (2d Cir. 1997) ("A party is not entitled to have the court give the jury an instruction for which there is no evidentiary predicate at trial.").

Second, UConn Health argues that the Court should have instructed the jury to consider the sexual harassment policy as evidence of reasonableness. UConn Health is correct that "the existence of an anti-harassment policy with complaint procedures is an important consideration in deciding whether the employer has exercised reasonable care." *Scoppettone v. Mamma Lombardi's Pizzico, Inc.*, 523 F. App'x 73, 75 (2d Cir. 2013) (summary order) (citation and quotation marks omitted).[4] The sexual harassment policy and avenues for complaint were certainly relevant to the questions of whether "in the exercise of reasonable care" Defendant should have known about the harassment, and whether, if the Defendant knew or should have known, "the Defendant's response was reasonable." (ECF No. 113 at 24.) And UConn Health appropriately urged the jury to focus on this evidence during closing argument. (ECF No. 113 at 45 ("But she did not report his conduct until February 24th, and she had the right to do beforehand…. there were many occasions where

---

[3] Plaintiff's counsel acknowledged in closing argument that "the issue in this case is not what the University of Connecticut did after she reported it. The issue in this case is what the University of Connecticut did prior to Mindy MacCluskey's report, but after having knowledge of the earlier report." (ECF No. 113 at 35-36.)

[4] This quote relates to the "reasonable avenue for complaint" theory of liability and on summary judgment, but similar logic holds true in this context.

she could have come forward."); *id.* at 50-51 ("Now, in regards to the sexual harassment policy that's been noted here, and that was the AD 2.2 Department of Corrections Sexual Harassment Policy…. It does have a very extensive complaint procedure and mechanism that Ms. MacCluskey easily could have taken advantage of prior to February 24th.").) But the fact that a certain piece of evidence is relevant or important does not require the Court to comment on it specifically in the jury charge. "The judge never is required to comment on the evidence; the matter is committed to the trial court's discretion." Wright & Miller, 9C Fed. Prac. & Proc. Civ. § 2557 (3d ed.); *see also United States v. Tourine*, 428 F. 2d 865, 869 (2d Cir. 1970) ("The trial judge in a federal court may summarize and comment upon the evidence and inferences to be drawn therefrom, in his discretion. This does not mean that he must include every scrap of evidence as if the jury were dependent upon the court's summation alone as the basis for its deliberations.")

Indeed, had I adopted UConn Health's proposal and recited in the charge its evidence that it had a sexual harassment policy, that "the policy was fully communicated to its employees," that the policy "provided a reasonable way for the Plaintiff to make a claim of harassment to higher management," and that "[r]easonable steps were taken to correct the problem if raised by the Plaintiff," I would also have been required specifically to instruct the jurors to consider some of the evidence Ms. MacCluskey wanted to emphasize, such as the requirement that UConn Health "monitor" Dr. Young, that the work environment left Ms. MacCluskey alone with Dr. Young for long periods of time in a remote area of the prison, and that the ODE report included an admission by Dr. Young that he had given shoulder rubs to other dental assistants. *See Bentley v. Stromberg-Carlson Corp.*, 638 F. 2d 9, 10-11 (2d Cir. 1981) (reversing and ordering new trial because of trial judge's errors in marshalling evidence in biased manner: "On such a record, it was imperative that

any comment by the judge in his charge to the jury be scrupulously fair and objective. Instead, the trial judge's charge started off by reciting the defendant's case in detail.")

Instead, I instructed the jury to "consider the totality of the circumstances" in determining reasonableness—which was a correct statement of the law and one that avoided the dangers of inappropriately underscoring certain items of evidence at the expense of others. (ECF No. 113 at 24.) *See Turley v. ISG Lackawanna, Inc*., 774 F.3d 140, 153-54 (2d Cir. 2014) (upholding a jury instruction in a co-worker hostile work environment case that read, "[w]hether an employer's response was reasonable has to be assessed from the totality of the circumstances"); *Stevenson v. Hearst Consol Publications*, 214 F.2d 902, 910 (2d Cir. 1954) ("The appellant criticizes the charge for the judge's failure to comment on the evidence…. However, we cannot say that the charge was legally inadequate because of its failure to include balanced comment on the evidence."); *Dobrich v. Gen. Dynamics Corp., Elec. Boat Div.*, 106 F. Supp. 2d 386, 394 (D. Conn. 2000) (upholding a jury instruction in a co-worker harassment case that stated, "[w]hether an employer's response was reasonable has to be assessed from the totality of the circumstances. Factors to be considered are the gravity of the harm being inflicted upon the plaintiff, the nature of the work environment, and the nature of the employer's response in light of the employer's resources.")

Third, UConn Health argues that I erred in omitting the proposed instruction: "[a]n employer is insulated from Title VII liability if a plaintiff does not invoke her employer's internal grievance procedure if the failure to report is not attributable to the conduct of the employer or its agent." This instruction makes incomplete reference to the *Faragher/Ellerth* affirmative defense, which, as discussed in Section III.C.2, applies only to supervisor harassment and is inapplicable to a co-worker case such as this one.  The proposed instruction also misstates the law applicable in this case. In fact, a plaintiff must demonstrate *either* "that her employer failed to provide a

reasonable avenue for complaint *or* that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch*, 588 F.3d at 762 (citations and quotation marks omitted, emphasis added).

2. <em>Language about Notice</em>

UConn Health next contends that the jury instructions about constructive notice were erroneous because (1) it was unclear what "harassment" meant and (2) the Court omitted instructions about the relevance of Ms. MacCluskey's decision not to report Dr. Young's harassment. UConn Health requested that the Court instruct the jury that:

> In reaching your determination on whether actual or constructive knowledge of any harassment can be imputed to the defendant UConn Health, the jury can consider that the law will not presume in every case that the employee who claims to have been harassed does not know what is best for themselves and cannot make reasonable decisions to delay- at least for a time pursuing a harassment claim, perhaps for privacy or emotional reasons until they are ready to do so.  Therefore, if you should determine that the plaintiff had decided not to report any harassment that had occurred because of a desire to maintain privacy or for other personal or emotional reasons, then you should find that the defendant UConn Health Center did not have actual or constructive notice about the harassment and therefore cannot be held liable under the negligence standard.

(ECF No. 68-1 at 12, 14-15 (internal citations and quotation marks omitted); *see also* ECF No. 86 at 19-22.)

First, UConn Health argues that the phrase "the employer knew, or in the exercise of reasonable care should have known, about the harassment" was confusing. In UConn Health's view, the jury could have understood "harassment," correctly, to mean the harassment Ms. MacCluskey suffered, or incorrectly, to mean either Dr. Young's earlier harassment of another woman or possible future harassment of Ms. MacCluskey. I agree that this phrase viewed in isolation could be ambiguous, but courts should not "dissect a jury verdict by combing through a trial court's instructions seeking language that, when isolated from its context, might be or appear to be misleading." *Turley*, 774 F.3d at 154. Instead, courts must ask "whether considered as a

whole, the instructions adequately communicated the essential ideas to the jury." *United States v. Schultz*, 333 F.3d 393, 414 (2d Cir.2003) (internal citations and quotation marks omitted).

In this case, read in context, "the harassment" meant Dr. Young's harassment of Ms. MacCluskey. The full instruction stated: "If you find that *the plaintiff was sexually harassed by Dr. Young* and that *the harassment* created a hostile work environment, the Defendant is liable if the Plaintiff demonstrates that the employer knew, or in the exercise of reasonable care should have known, about *the harassment* but failed to take appropriate remedial action." (ECF No. 113 at 23-24 (emphasis added).) "[T]he harassment" in the final phrase of the sentence refers back to the phrase, "the plaintiff was sexually harassed by Dr. Young."

Further, the jury asked for clarification about Question 2 of the verdict form, which read (without the surrounding context found in the charge): "Do you find that the plaintiff has proven that the defendant knew, or in the exercise of reasonable care should have known, about the harassment but failed to take appropriate remedial action." (ECF No. 89.) The jury asked, "In Q2, does 'harassment' include the 2000 incident with Dr. Young." (ECF No. 114 at 3.) I clarified, "[t]he answer to your question is no. Harassment, as used in question 2, refers to any harassment you found Dr. Young to have perpetrated against the Plaintiff."  (*Id.* at 8.) UConn Health did not object to this supplemental instruction or suggest that any further clarification was needed. (*Id.* at 6-9.)

Second, UConn Health argues that I failed to properly explain the concept of constructive notice[5] when I omitted instructions about Ms. MacCluskey's own decision to delay reporting.

---

[5] The technical term "constructive notice" did not, in fact, appear in the final jury charge—instead the charge instructed the jury to consider whether UConn Health "in the exercise of reasonable care should have known" about the harassment. UConn Health's own proposed instructions used the term "constructive notice" but did not provide a general definition beyond "in exercise of reasonable care should have known."

UConn Health requested language from *Torres v. Pisano*, 116 F.3d 625, 639 (2d Cir. 1997), stating that "the law will not presume in every case that harassed members of Title VII's protected classes do not know what is best for themselves and cannot make reasonable decisions to delay—at least for a time—pursuing harassment claims, perhaps for privacy or emotional reasons, until they are ready to do so." In *Torres* and also with regard to one of the supervisors at issue in *Duch*, 588 F.3d at 764, the Second Circuit held that an employer's response was reasonable where the employee had complained but specifically asked the employer to keep the matter confidential. This is markedly different from the scenario in this case: unlike in *Torres* and *Duch*, there was no evidence here that Ms. MacCluskey asked her supervisor to keep the harassment confidential. And in both *Torres* and the applicable portion of *Duch*, the issue was not about whether the employer had notice of the harassment (plainly it did), but whether its *response was reasonable* in light of that notice. The *Torres* language is therefore inapplicable. This is not to disagree, of course, with the basic proposition that "the fact that a complaint was unreported may be relevant in considering whether an employer had knowledge of the alleged conduct," *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 64 (2d Cir. 1998). But as discussed above, I was not required to comment specifically on all relevant evidence in the jury charge.

### 3.    *Business Judgment Rule*

Next, UConn Health argues that I erred by omitting the following proposed instructions on business judgment:

> As you consider the evidence you must keep in mind that the employer's business judgment is not the issue in this case with regard to the actions it took against Dr. Young, for example any discipline it took, but rather you must focus solely on the employer's motivation for its action. The plaintiff must show more than that the defendants made unwise business decisions or unnecessary personnel moves, or acted arbitrarily. Good faith errors in an employer's business judgment are not, standing alone, evidence of discrimination....

In considering defendant's stated reasons for its decision, you are not to second-guess the wisdom or reasonableness of the defendant's business decision. As you consider the evidence you must keep in mind that the employer's business judgment is not the issue, but rather you must focus solely on the employer's motivation for its action. The plaintiff must show more than that the defendant made an unwise business decision or unnecessary personnel move, or acted arbitrarily. Good faith errors in an employer's business judgment are not, standing alone, evidence of discrimination. Your job is not to second guess the defendant's business judgment; your job is to determine if the judgment, whether wise or foolish, was motivated by discrimination. Simply put, your role is not to act as a "super personnel department" that second-guesses the employer's business judgment.

(ECF No. 68-1 at 15-16) (internal citations omitted).)

As I stated at the charge conference, such an instruction on UConn Health's business judgment would have been improper in this case.  The business judgment rule cited by UConn Health applies to claims of intentional discrimination, where fact-finders, in deciding whether an employer's reasons amount to pretext, should not substitute their own business judgment for that of the employer. *See, e.g. Gomez v. Metro. Dist.*, 10 F. Supp. 3d 224, 239 (D. Conn. 2014). It is not relevant to this case, and, in fact, it would have misled the jury to instruct them that they "must focus solely on the employer's motivation for its action" in a negligence case. Further, as discussed above, I did not instruct the jury to consider whether UConn Health's response to the 2000 incident was reasonable, but rather whether its response to Dr. Young's harassment of Ms. MacCluskey was reasonable (if it "knew, or in the exercise of reasonable care should have known" about that harassment).

### 4.    Limiting Instruction on the 2000 Complaint

Finally, UConn Health objects to my limiting instruction about the 2000 complaint:

You heard evidence that a complaint was filed in or around 2000 with the Commission on Human Rights and Opportunities in relation to a claim that Michael Young engaged in improper conduct against a dental assistant. I instruct you that you may consider this evidence only for the limited purpose of deciding whether or not the Defendant knew or should have known that Dr. Young had a propensity to engage in the type of conduct about which the plaintiff is complaining in this case. You are not to consider this evidence for any other purpose.

(ECF No. 113 at 9.)

UConn Health failed to timely object to this jury instruction under Fed. R. Civ. P. 51(c), raising the objection for the first time in this motion. (ECF No. 115 at 2-3.) In fact, UConn Health *requested* that I give this limiting instruction. (ECF No. 112 at 2-3.)  Nonetheless, the "court may consider a plain error in the instructions that has not been preserved as required … if the error affects substantial rights." Fed. R. Civ. P. 51(d)(2). "To constitute plain error, a court's action must contravene an established rule of law."  *Tirreno v. Mott*, 375 F. App'x 140, 142 (2d Cir. 2010) (citation and quotation marks omitted). "[T]he plain error exception should only be invoked with extreme caution in the civil context. Only where an unpreserved error is so serious and flagrant that it goes to the very integrity of the trial will a new civil trial be warranted." *Liverpool v. Con-Way Freight*, 487 F. App'x 595, 597 (2d Cir. 2012) (citation, quotation marks, and alteration omitted).

The limiting instruction was not plain error. It is true that the earlier complaint of harassment by a different employee, *by itself,* would be insufficient to support a finding of constructive knowledge of harassment of the plaintiff. *See Kotcher v. Rosa & Sullivan Appliance Ctr., Inc*., 957 F.2d 59, 63 (2d Cir. 1992). But it is nonetheless relevant to the question of constructive knowledge. As I previously stated, "a jury could reasonably infer that an employer who is aware that its employee, a dentist, previously harassed a dental assistant is more likely to have knowledge or constructive knowledge of that dentist's later similar harassment of another dental assistant under the auspices of the employer." (ECF No. 73 at 2.) *See, e.g. Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001) (In a Title VII co-worker harassment case, "[a] reasonable factfinder might conclude that [the employer's] negligence made it responsible for [plaintiff's] rape. [The employer] had notice of [the co-worker's] proclivity to rape co-workers.

The fact that [the co-worker's] prior rapes were not of [plaintiff] but of other co-workers is not preclusive. If an employer is on notice of a likelihood that a particular employee's proclivities place other employees at unreasonable risk of rape, the employer does not escape responsibility to warn or protect likely future victims merely because the abusive employee has not previously abused those particular employees."); *Reitter v. City of Sacramento*, 87 F. Supp. 2d 1040, 1044 (E.D. Cal. 2000) (in Title VII co-worker sexual harassment case, "[t]he question is whether the City's supervisory employees knew or should have known before that date about [the co-worker's] propensity for misconduct and thus, acted before plaintiff's injury.") The charge properly instructed the jury to limit their consideration of the 2000 complaint to "whether or not the Defendant knew or should have known that Dr. Young had a propensity to engage in the type of conduct about which the plaintiff is complaining in this case." The federal rules of evidence regarding prior bad acts cited by UConn Health have no bearing on this issue.

C.   **Exclusion of E-mail Exhibit**

Finally, UConn Health argues that I erred in excluding an e-mail it offered into evidence. At trial, UConn Health offered an e-mail from "MacCluskey, Mindy" to "lmjymy@yahoo.com" dated December 9, 2010 11:22 AM and titled "FW: A funny or 2." (ECF No. 111 at 33-35.) The contents of the email read, "SOMETHING FOR A LAUGH  MIKE" and included several cartoon attachments, including some with sexually graphic content. UConn Health claims that Ms. MacCluskey sent this email to Dr. Young. However, Ms. MacCluskey denied sending the email to Dr. Young and stated that she did not recognize the email address it was sent to. (ECF No. 111 at 34.) Outside of the jury's presence, UConn Health then presented two witnesses to lay the foundation for admission of the e-mail. Thomas Murphy, IT Director and Information Security Officer, testified that e-mail in question was sent from Ms. MacCluskey's work e-mail account,

but that he did not know if Ms. MacCluskey had sent it.  (ECF No. 112 at 126.) He testified that

the e-mail account is password protected, but that if Ms. MacCluskey had opened her email, the e-

mail account could have been up for 15 minutes before the screen locked. (ECF No. 112 at 124-

28.)  Christian Angrensen from the Department of Public Health testified that the email address

"lmjymy@yahoo.com" was connected to the practitioner profile of Lisa M. Jordan, at least as of

June 1, 2016. (*Id.* at 142-46). UConn Health pointed out that Lisa M. Jordan is also known as Lisa

Young, Dr. Young's wife. UConn Health invited me to surmise that "lmjymy@yahoo.com" was

an e-mail address shared by Lisa Jordan/Young and her husband, based on the use of "Mike" in

the body of the email. It could also plausibly have been the case that Dr. Young himself sent this

email to his wife (signing off "Mike") from Ms. MacCluskey's email account on their shared work

station. Neither Dr. Young nor his wife testified at trial, and there was otherwise no evidence about

the owner and user(s) of the lmjymy@yahoo.com e-mail address.

I properly excluded the email under Federal Rules of Evidence 104(b) and 403.[6] Under

Rule 104(b), "[w]hen the relevance of evidence depends on whether a fact exists, proof must be

introduced sufficient to support a finding that the fact does exist." "When faced with a question of

conditional relevance, the district court should examine all the evidence in the case and decide

whether the jury could reasonably find the conditional fact by a preponderance of the evidence."

*United States v. Coplan*, 703 F.3d 46, 81 (2d Cir. 2012) (citation, quotation marks, and alteration

omitted). Here, the use of "Mike" in the body of the email and the evidence that the e-mail was

sent to an address associated with Dr. Young's wife was not sufficient to support a finding that

---

[6] The parties also debate whether the exhibit was properly authenticated. However, authentication is not at issue here: I explained on the record that "there is really no issue of authenticity." (ECF No. 112 at 135.)

Ms. MacCluskey sent the e-mail to Dr. Young, especially in light of the fact that it was not sent to Dr. Young's own e-mail address and that Ms. MacCluskey denied sending it.

Even if the evidence crossed the relevance threshold, exclusion was proper under Rule 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "District court judges enjoy wide latitude in determining whether evidence is admissible at trial." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000).  "[A] court's failure to admit *highly probative* evidence that is likely to have a *profound impact* on the outcome of the trial may… be grounds for a new trial" under Fed. R. Civ. P. 59. *LNC Investments, Inc. v. First Fid. Bank*, 126 F. Supp. 2d 778, 787 (S.D.N.Y. 2001) (quoting 12 Moore's Federal Practice § 59.13) (emphasis added). In this case, where there was slight evidence Ms. MacCluskey sent the e-mail, and slight evidence it was sent to Dr. Young, the e-mail had, at best, slight probative value to the question of whether Dr. Young's sexual advances were unwelcome. Any probative value was diminished further by the fact that UConn Health's defense was not focused on whether Ms. MacCluskey was sexually harassed or whether any such harassment created a hostile work environment. Although UConn Health did not formally concede these points, it told the jurors that they "can accept… as a given" the ODE report, which included a finding that Dr. Young's conduct towards Ms. MacCluskey violated UConn Health's sexual harassment policy, and specifically, that it was "unwelcome." (ECF No. 37-9 at 28-31.) I acted well within my discretion in determining that any slight probative value was substantially outweighed by a danger of unfair prejudice and confusion.

## V.    Motion for Remittitur

### A.    Legal Standard

Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir. 1990) (citation and quotation marks omitted). "It is well settled that calculation of damages is the province of the jury." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990).  However, federal law provides that a verdict is excessive if "the award is so high as to shock the judicial conscience and constitute a denial of justice." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (citation and quotation marks omitted). To determine whether an award shocks the judicial conscience, "a review of comparable cases is appropriate." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012).  A court should not "average the high and low awards," but must "focus instead on whether the verdict lies within the reasonable range." *Id.* (citation, quotation marks, and alteration omitted.) "If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995).  If a district court opts for the remittitur procedure, it should remit the jury's award "only to the maximum amount that would be upheld by the district court as not excessive." *Zeno*, 702 F. 3d at 672 (citation omitted).

### B.    Discussion

UConn Health seeks a remittitur on the grounds that the jury's award of $200,000 in compensatory damages was excessive for a "garden variety" emotional distress claim. I agree, and remit the award to $125,000.

In garden variety emotional distress claims in the Second Circuit, "the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." *Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (citation and quotation marks omitted). "Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration." *Id.* (citation and quotation marks omitted). In contrast, "significant" emotional distress claims "are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." *Id.* at 46–47 (citation and quotation marks omitted).

This case falls in the garden variety category. Ms. MacCluskey described multiple incidents of sexual harassment over a sustained period in isolated prison dental units, including Dr. Young grabbing her waist and putting his hand up her shirt. She cried during her testimony and described how the experience had affected and continues to affect her. She testified that after Dr. Young's harassment, she felt "ashamed and embarrassed," was "afraid to be home alone," "afraid to go out in public," and "didn't sleep for weeks." (ECF No. 110 at 54-56.) She stated that her work was affected and that she used all of her time off when she started working at a new facility. Ms. MacCluskey also testified to the ongoing effects of the harassment. She said, "[i]t's changed my whole life… I always trusted people and now I don't trust anybody. There's things that bring me back to this time in [Department of Corrections] on a regular basis. I could be in line at the grocery store and feel somebody behind me and totally panic because I feel like I'm unsafe." (*Id.*) She explained that with Dr. Young, "it started innocent. You look nice today. Great. Well, now when somebody says you look nice today, I look at them what do you want." (*Id.*) Ms.

MacCluskey stated that her family and friends have noticed the change as well, and that the harassment has also affected her relationship with her children: "It still affects the way people perceive me because I'm so cautious. I don't let my kids go anywhere. My son's 15. He just had his first sleepover and it's because of this. [Dr. Young] bullied me when I was at work." (*Id.* at 56.) She did not provide any evidence of emotional distress beyond her own testimony.

In the Second Circuit, "[g]arden variety emotional distress claims generally merit $30,000 to $125,000 awards." *Olsen*, 615 F. Supp. at 46 (citation and quotation marks omitted). *See also Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) ("This Court has… affirmed awards of $125,000 each to plaintiffs… where the evidence of emotional distress consisted only of testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress") (quotation marks omitted); *Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360, 379 (D. Conn. 2016) (remitting $500,000 emotional distress award to $125,000 in garden variety emotional distress case, noting that $125,000 "is near the top of the range in 'garden variety' emotional distress cases"); *Parris v. Pappas*, 844 F. Supp. 2d 271, 278 (D. Conn. 2012) ("Garden variety emotional distress claims generally merit $30,000 to $125,000 awards.")

The cases cited by Ms. MacCluskey for the proposition that $200,000 is within the range of garden variety emotional distress awards are distinguishable from this one. In *Castelluccio v. Int'l Bus. Machines Corp.*, the court upheld $500,000 in emotional distress damages, finding that "[a]lthough [plaintiff's] emotional distress is garden-variety inasmuch as he presented no corroborating testimony or evidence of medical treatment, the court concludes that the specific circumstances of this case… justify an upward departure from the typical emotional distress damages award." 2014 WL 3696365, at *13 (D. Conn. 2014). Those "specific circumstances" were significantly more severe than the circumstances in this case. In *Castelluccio*, the employee was

terminated from a job where he had worked for 40 years, and struggled to secure employment afterward. "The jury bore witness to a man who was utterly devastated by the termination of his employment," who suffered "mood swings, sleepless nights, weight loss, and hair loss." *Id.* In *Phillips v. Bowen,* the Second Circuit upheld a $400,000 damages award ($200,000 per defendant) where the plaintiff was egregiously harassed over five years. 278 F.3d 103 (2d Cir. 2002). Unlike in this case, the plaintiff had more than her own testimony and the emotional distress included physical illness: "her boyfriend testified in detail about her emotional distress, physical illness, and the effects of defendants' conduct on her lifestyle and relationships. [Plaintiff's] co-workers testified about the deterioration they observed in [her]. Other less direct indicia of plaintiff's damages came from the defendants themselves, who unapologetically described their treatment of plaintiff." *Id.* at 111-12.

I therefore conclude I must remit the jury's $200,000 verdict to $125,000, which is at or near the top of the range for garden variety emotional distress awards in this Circuit and thus reflects the jury's view that Ms. MacCluskey's distress was considerable. $125,000 is "the maximum amount that would be upheld by the district court as not excessive." *Zeno*, 702 F. 3d at 672 (citation omitted). Accordingly, I order a new trial on damages unless, within 21 days of this ruling, Ms. MacCluskey agrees to remit the compensatory damages award to $125,000.

**VI.    Conclusion**

For the reasons discussed above, UConn Health's motions (ECF No. 100) for judgment as a matter of law and new trial are DENIED, and its motion (ECF No. 100) for remittitur is GRANTED. I order a new trial on damages unless, within 14 days of this ruling, Ms. MacCluskey agrees to remit the compensatory damages award to $125,000.

The earlier oral motion for judgment as a matter of law (ECF No. 82) is DENIED as moot. UConn Health's motion to stay (ECF No. 97) is GRANTED in part: within 14 days of this Order, UConn Health may, if it wishes, file a response to Ms. MacCluskey's motion (ECF No. 96) for attorney's fees and costs. Ms. MacCluskey will then have 7 days to file a reply.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut

                February 21, 2017